DWAYNE DAILEY,

                Petitioner,

– against –

HAROLD D. GRAHAM,

                Respondent.

**MEMORANDUM & ORDER**

12-CV-6034 (ERK)

KORMAN, J.:

      I assume familiarity with the underlying facts and circumstances of this case. Briefly, on February 17, 2008, in the parking lot behind the Don Juan night club in Westbury, New York, petitioner, Dwayne Dailey, shot into a car filled with four people, killing one and hitting the three others. Trial Tr. 1670–71. Petitioner was convicted after a jury verdict of one count of murder in the second degree, three counts of attempted murder in the second degree, three counts of assault in the second degree, three counts of criminal possession of a weapon in the second degree, and one count of criminal possession of a weapon in the second degree. Trial Tr. 3309–11. For the murder conviction the trial judge sentenced petitioner to twenty-five years to life and for each of the three attempted murder counts, petitioner was sentenced to twenty five years. Sent. Tr. 13–14. These sentences run consecutively. *Id.* Additionally, the trial judge sentenced the petitioner to twenty-five years for each of the three assault convictions and fifteen years for each of the four possession of a weapon convictions. *Id.* These seven sentences run concurrently with the murder count. *Id.* On appeal, the Appellate Division unanimously upheld all eleven convictions. *People v. Dailey,* 86 A.D.3d 579 (N.Y. App. Div. 2011).

1

Petitioner raises six issues in his petition for writ of habeas corpus and I discuss them separately below.

*1. Racial Make-up of Jury Panels*

Petitioner argues that the prospective jury panels were racially unrepresentative when compared to the general Nassau County population and thus were in violation of the Sixth Amendment's fair-cross-section requirement. Three different venire panels—each broken into several rounds—were used during jury selection and petitioner orally challenged all three panels, claiming that they contained an impermissibly low number of African-Americans. Voir Dire Tr. 56–57, 249–50, 579–80. Petitioner lodged three written challenges with the trial judge, claiming that the venire panels only had 3.33%, 6.25%, and 12.5% "African-American/Minority" respectively, while also noting, without any citation, that "it is commonly known that the African-American/Minority population of Nassau County ranges from approximately 19–23%." The trial judge denied each of the challenges with little explanation. *Id.* at 57, 207, 250, 396, 580, 661. The Appellate Division affirmed the trial judge's ruling, holding that petitioner's motions were deficient because they failed to allege any facts that demonstrated that the underrepresentation was the result of systematic exclusion of minority jurors. *Dailey,* 86 A.D.3d at 579.

In *Duren v. Missouri*, the Supreme Court held that to establish a prima facie violation of the Sixth Amendment's fair-cross-section requirement, a challenger must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

439 U.S. 357, 364 (1979). Here, there is no dispute that the first prong has been established. *See* Mem. Opp'n Habeas Corpus 4.

Turning to the *Duren* test's second prong, "initially the defendant must demonstrate the percentage of the community made up of the group alleged to be underrepresented, for this is the conceptual benchmark for the Sixth Amendment fair-cross-section requirement." *Duren,* 439 U.S. at 364. "An absolute disparity of 10% between the group's representation on the panel and the group's representation among those eligible for jury service is typically sufficient to show underrepresentation." Wayne R. LaFave, et al., *Criminal Procedure* §22.2(d) at page 60 (3d ed. 2007). Here, the petitioner cites no authority when claiming that the African-American population of Nassau County ranges from 19%–23%. Pet'r's Br. N.Y. App. Div. 32–33. In fact, according to 2010 census data, Blacks/African-Americans made up 11.1% of the Nassau County population. U.S. Census Bureau: Community Facts: Nassau County, NY, http://factfinder.census.gov/bkmk/table/1.0/en/DEC/10_DP/DPDP1/0500000US36059 (last visited August 12, 2015). More significantly, petitioner, who bears the burden of proof under *Duren*, a burden that is reinforced in a habeas corpus proceeding where "the petitioner bears the burden of proving that his constitutional rights were violated," *Whitaker v. Meachum*, 123 F.3d 714, 716 (2d Cir. 1997), has come forward with no statistics of that "group's representation among those eligible for jury service."

In any event, it is unnecessary to determine whether the three jury panels here—made up respectively of 3.33%, 6.25%, and 12.5% African Americans—were reasonably representative of the Nassau community because petitioner is clearly unable to meet the burden of the third *Duren* prong. The petitioner put forward no evidence at trial, before the Appellate Division, or in this petition that the alleged underrepresentation was the result of a systematic exclusion of minorities in the jury selection process. Systematic exclusion occurs "when the underrepresentation is due to the system of jury selection itself." *United States v. Rioux,* 97 F.3d, 648, 658 (2d Cir. 1996). "No 'clearly established' precedent of [the Supreme] Court supports

[petitioner's] claim that he can make out a prima facie case merely by pointing to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation." *Berghuis v. Smith,* 559 U.S. 314, 332 (2010) (emphasis in original). In *Duren,* the defendant showed that the discrepancy in jury venires happened not just occasionally, but every week for nearly a year. *Duren,* 439 U.S. at 366. Moreover, the *Duren* defendant was able to show systematic exclusion by pointing to a questionnaire that prospective jurors filled out with a section that allowed women to opt out of jury duty. *Id.* Moreover, Jackson County, from which the case arose, presumed all women opted out if they did not respond to the summons to appear for jury duty. *Id.* Here, in contrast, petitioner simply says the racial representation of the three jury panels in his case is proof that African Americans were systemically excluded from Nassau County juries. Ap. Br. App. Div. 35. This is not enough to satisfy the third prong of the *Duren* analysis. Indeed, without evidence of some policy that excludes minority jurors—or greater statistical evidence showing such exclusion even exists—it seems more likely that any underrepresentation in this case was a matter of simple statistical variation. *See United States v. Joyner*, 201 F.3d 61, 75 (2d Cir. 2000) (holding there was no systematic discrimination even though there was only one African-American on venire panel of 500); *United States v. Young*, 822 F.2d 1234, 1239 (2d Cir. 1987) (holding there was no systematic exclusion of minorities despite "all-white venire" because selection process was random). Thus, the Appellate Division's ruling on the racial makeup of the jury panels was not an unreasonable application of clearly established federal law as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

*2.* Batson *Challenge*

Petitioner argues that the trial judge and Appellate Division erred in rejecting his claims under *Batson v. Kentucky*, 476 U.S. 79 (1986), after the prosecutor used five peremptory challenges to strike one Hispanic and four black prospective jurors. In *Batson,* the Supreme

4

Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." *Id* at 89. Courts weighing a *Batson* challenge follow a three-step inquiry: First, the party raising the challenge must make a prima facie showing that the party exercising the peremptory challenge is doing so on the basis of race. *Id.* at 96–97. If the challenger makes out a prima facie case, the party opposing the challenge must provide a race neutral reason for its peremptory strikes. *Id.* at 97–98. "Finally, step three returns the ball to the challenger, who must then show that the professed race neutral reasons were pretextual and prove racial discrimination was the real motive." *Richardson v. Greene*, 497 F.3d 212, 214 (2d Cir. 2007). Throughout this process, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

Petitioner raised *Batson* challenges to the prosecution's use of peremptory challenges against four of seven African-American prospective jurors and one Hispanic prospective juror. In each instance, the trial judge ruled that petitioner had not satisfied the first step of the *Batson* inquiry because he had failed to make a prima facie case of discrimination. The trial judge also directed the prosecution to provide race-neutral reasons for each strike in the event that the Appellate Division found the he erred in ruling that no prima facie case had been made. In each instance, the judge ruled that the prosecution's race-neutral reasons were not pretextual. Significantly, the explanations the prosecutor gave for his peremptory strikes are supported by numerous instances in the record of the prosecutor challenging non-minority jurors with similar characteristics. Wayne R. LaFave, et al., *Criminal Procedure* §22.3(d) at page 146 (3d ed. 2007) ("An attorney's race-neutral reason is more likely to be believed if the record indicates that she challenged prospective jurors of both races for that reason."); *see also Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just

5

as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step.).

Petitioner first raised a *Batson* challenge when the prosecutor used a peremptory challenge on Coretta James, an African American woman. Trial Tr. at 385–86. The trial judge rejected the challenge, stating that petitioner had not made a prima facie case of discrimination, but nonetheless asked the prosecutor to state race-neutral reasons for the record. *Id.* The prosecutor said he was concerned that because James was a middle-school librarian and regularly disciplined students, she would be unable to impartially judge the testimony of the cooperating witnesses, one of whom was 15 years old. *Id.* at 386–87. The prosecution also stated that James was not very forthcoming in her responses to his questions. *Id.* at 388. In the same round of jury selection, the prosecution also exercised a peremptory challenge against a non-minority prospective juror who, as an assistant principal, also had responsibility for disciplining students. *Id.* at 338–39, 387. The trial judge accepted these race-neutral reasons as non-pretextual. *Id.*

After questioning a later panel, the prosecutor used a peremptory challenge on Vanessa Phill, an African-American woman, and again the defense raised a *Batson* challenge. *Id.* at 462. The trial judge rejected the challenge based on petitioner's failure to establish a prima facie case of discrimination, remarking that one of the four jurors already accepted was an African-American female. *Id*. at 463. Nevertheless, the judge once more asked the prosecutor to provide race-neutral reasoning for the challenge and the prosecutor said that he struck Phill because her husband worked for the New York City Department of Mental Health and some of his clients passed through the justice system. *Id.* at 464. The trial judge accepted this as a non-pretextual race-neutral reason. *Id.* at 466.

In the same group of prospective jurors as Phill, the prosecutor used a peremptory challenge on Dolores Roque, a Hispanic woman, and the defense raised a *Batson* challenge. *Id.*

6

at 469.  The trial judge still did not find a "pattern of systemic discrimination" and thus rejected the challenge at the prima facie stage.  *Id.* at 472.  The prosecutor said that he exercised his peremptory against Roque because she said that she needed to hear from both sides when evaluating the case.  *Id.* at 470.  Because the defense was unlikely to put on a case, the prosecutor said he was concerned that she would think petitioner did not get proper representation and thus hold it against the prosecution.  *Id.*  The prosecution expressed similar concerns and moved to strike four non-minority jurors (including two struck for cause with consent of defense counsel) who also expressed a need to hear from both sides in deciding a case.  *Id*. at 195–97, 327, 703.  Once again, the trial judge accepted this as a race-neutral explanation.  *Id.* at 472.  Moreover, there are no other indications in the record of the prosecution using peremptory challenges to strike Hispanic jurors.

Finally, the prosecutor used two peremptory challenges on Wairimu Njiiri and Laura Yacinthe, both African-American women, and petitioner challenged both on the basis of *Batson*.  *Id.* at 541,783.  In both instances the trial judge rejected the challenge, holding that petitioner did not establish a prima facie case of discrimination based on the fact that two sworn jurors were African American.  *Id.* at 784, 543.  The prosecutor's reasoning for striking Njiiri and Yacinthe was the same: they both went to private high schools and had limited life experiences regarding gang activity, which would prevent them from evaluating some of the witnesses fairly.  *Id.* at 544, 783–784.  The judge accepted the prosecutor's reasoning as non-pretextual in both instances.  *Id.* at 545, 784.

In sum, of the nineteen peremptory challenges exercised by the prosecution, four were used against African-Americans prospective jurors and one against a Hispanic prospective juror.  Three African-American jurors were seated, though one was dismissed at her own request for personal reasons.  *Id.* at 659, 3245.  The Appellate Division affirmed the trial judge's finding that

the proffered race neutral reasons were non-pretextual and supported by the record. *Dailey,* 86 A.D.3d at 579.

The Supreme Court has held that a trial judge's determination on *Batson* challenges is entitled to high deference:

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province.

*Hernandez v. New York*, 500 U.S. 352, 365 (1991) (internal citations omitted). More recently, the Supreme Court has emphasized that perhaps greater deference is due to the trial judge's determination of credibility when challenged in a petition for a writ of habeas corpus. After reiterating that the *Batson* issue turns largely on an evaluation of credibility and that the trial judge's determination is entitled to great deference which "must be sustained unless it is clearly erroneous," the Supreme Court reminded the Ninth Circuit that that "[o]n federal habeas review, AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594 (2011) (internal quotation omitted). Indeed, the Ninth Circuit has since described that standard as "doubly deferential: unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must uphold it." *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012).

In the case at bar, petitioner has not met his burden of showing that the trial judge acted unreasonably in crediting the prosecutor's race-neutral reasons. All of the prosecutor's reasons were race neutral and reasonable. *See e.g.*, *Messiah v. Duncan*, 435 F.3d 186, 200 (2d Cir. 2006) (holding that the race-neutral reason of spouse's employment in a law office was valid and

8

reasonable); *Jordan v. Lefevre*, 293 F.3d 587, 595 (2d Cir. 2002) (accepting lack of maturity and experience in making important decisions as valid race-neutral reason on habeas review); *Thigpen v. Brown,* No. 06CV3110NG(VVP), 2008 WL 5110890, at *11 (E.D.N.Y. Dec. 2, 2008) ("Strikes based on a prospective juror's profession . . . are acceptable") (citing *United States v. Alvarado*, 951 F.2d 22, 25 (2d Cir. 1991)). Indeed, supporting the finding that the prosecutor's reasons were non-pretextual, the record shows numerous instances of the prosecutor challenging non-minority jurors with similar characteristics to the struck minority jurors. Trial Tr. 195–97, 327, 387, 703. Moreover, the prosecution did not challenge all African-American and Hispanic prospective jurors and three African-Americans were ultimately chosen to be on the jury. Trial Tr. 659, 3245. Given the high deference that must be given to the trial judge's determination paired with the plausibility and validity of the prosecutor's race-neutral reasons, petitioner's argument fails.

   *3. Constitutionality of Statute*

Petitioner argues that New York Penal Law § 265.03(3) is unconstitutionally vague and overbroad. The statute—criminal possession of a weapon in the second degree—provides that:

> A person is guilty of criminal possession of a weapon in the second degree when . . . such person possesses any loaded firearm. Such possession shall not, except as provided in subdivision one or seven of section 265.02 of this article, constitute a violation of this subdivision if such possession takes place in such person's home or place of business.

N.Y.P.L. § 265.03(3). The Appellate Division dismissed this claim exclusively on state procedural grounds, holding that the contention was unpreserved and thus unreviewable. *Dailey,* 86 A.D.3d at 579.

Because the last state court to render a judgment on the case rested its decision on an independent and adequate state ground—the failure to preserve the claim through contemporaneous objection before the trial judge—petitioner is procedurally barred from obtaining habeas relief in federal court. *Coleman v. Thompson*, 501 U.S. 722, 735 (1991). The

Appellate Division here dismissed petitioner's constitutional challenge because it had not been raised before the trial judge. Because petitioner has made no showing of cause and prejudice, nor of actual innocence, he is not entitled to federal habeas relief. *Id.* at 750.

In any event, petitioner's claim is frivolous. Petitioner argued before the Appellate Division that the law "is vague because it imposes criminal liability even on one acting in a lawful manner; that is, a person who possesses a firearm . . . but who is licensed to possess a firearm." Petr.'s App. Div. Br. 54. He argued that the law was overbroad for substantially the same reason. *Id.* This interpretation, however, is possible only with a blinkered reading of the law that ignores the exemptions listed in a different subsection of the statute, specifically the exemption for the possession of a licensed firearm. N.Y.P.L. § 265.20(a)(3). Moreover, no violation of the Second Amendment arises from a reasonable regulation prohibiting the unlicensed possession of loaded firearms. *See McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010); *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008).

### 4. *Sufficiency of Evidence*

Petitioner next argues that there was legally insufficient evidence to convict him. During the trial, in exchange for leniency, four of Dailey's accomplices testified about Dailey's involvement in the series of events that occurred on the night of the shooting. Trial Tr. 1684–89, 1910–12, 2200–01, 2864–65. On direct appeal, petitioner argued that there was insufficient independent evidence apart from accomplice testimony to convict. Pet'r's Br. N.Y. App. Div. 59–61. The Appellate Division held that the evidence "was legally sufficient to establish the defendant's guilt beyond a reasonable doubt" and that the trial judge's ruling was in accordance with New York Criminal Procedure Law § 60.22[1], which requires corroborative evidence in addition to cooperating accomplice testimony connecting the defendant with the "commission of the relevant offense." *Dailey,* 86 A.D.3d at 579. To the extent that this petition challenges the

Appellate Division's application of New York Criminal Procedure Law § 60.22[1], it is "not cognizable in a petition for a federal writ of habeas corpus." *Gaiter v. Lord*, 917 F. Supp. 145, 150 (E.D.N.Y. 1996). "This claim does not rise to the level of a constitutional violation because the Federal Constitution does not prohibit the conviction of a defendant based on the uncorroborated testimony of an accomplice." *Id.* Setting aside petitioner's non-cognizable state law claim, I turn now to whether the Appellate Division was unreasonable in finding that petitioner's conviction was supported by sufficient evidence.

To prevail under a sufficiency of evidence argument in a petition for habeas corpus, petitioner "bears a very heavy burden." *Einaugler v. Supreme Court,* 109 F.3d 836, 840 (2d Cir. 1997). In reviewing a sufficiency of evidence argument, the reviewing court must decide whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original). "What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (internal quotation omitted). Simply put, the record does not support the petitioner's claim that the trial or appellate court's decisions were unreasonable. In addition to testimony from four accomplices, there was ample evidence in the form of testimony from medical examiners, police officers, and witnesses, as well as cell phone records and recovery of the murder weapon. Moreover, two non-accomplices testified that Dailey confessed to them that he was the shooter. *Id.* at 1336–37, 2597–98. During the sentencing hearing, the trial judge put on record that in over 20 years in the court system, he had "never seen so much overwhelming

evidence." Sent. Tr. 11. It is not unreasonable for the Appellate Division to have ruled that a rational juror could reach the same conclusion.

　　　　*5. Suggestiveness of Photographic Arrays*

Petitioner argues that the photographic arrays from which witnesses identified him to police—which identifications the police testified to at trial—were unduly suggestive. Prior to the trial, the judge held a *Wade* hearing on the photo-pack identifications made by eight separate witnesses to law enforcement during the investigation of the shooting. Hr'g Tr. 2. The photo-packs, which contained a photograph of Dailey along with five other men with generally similar hair, skin color, and facial features, were used for identification purposes after detectives interviewed witnesses. *Id.* at 18, 45. Prior to the identification, all eight of the witnesses informed detectives that they knew Dailey before the shooting on February 17, 2008. *Id.* at 23, 31, 38, 63, 71, 75, 89, 115. In addition, all but two witnesses identified Dailey in the photographs almost immediately. *Id.* at 23, 37, 42, 70, 75, 89. During the suppression hearing, petitioner claimed that the photo-packs were unduly suggestive because Dailey was the only person in the six photos wearing an orange shirt, allegedly suggesting a prison jumpsuit. *Id.* at 320–21. The court denied the petitioner's motion to suppress, ruling that the photo array was not unduly suggestive and that the individuals in the array were "sufficiently similar in appearance to the defendant." Resp't's Br. N.Y. App. Div. at 56–57.

"In general, a pretrial photographic identification procedure used by law enforcement officials violates due process if the procedure 'is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Jarrett v. Headley*, 802 F.2d 34, 40–41 (2d Cir. 1986) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1969)). "It is the likelihood of misidentification which violates a defendant's right to due process." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). "There is no requirement . . . that photos in an array present only

individuals who match petitioner's appearance in every detail." *Velazquez v. Poole*, 614 F. Supp. 2d 284, 300–01 (E.D.N.Y. 2007). Rather, the Second Circuit has only required that "[t]he array must not be so limited that the defendant is the only one to match the witness's description of the perpetrator." *United States v. Maldonado-Rivera*, 922 F.2d 934, 974 (2d Cir. 1990). Here, the Appellate Division confirmed the trial judge's determination and made a factual finding that "[t]here were no characteristics of the defendant's picture that made it stand out in any way from the others in the arrays so as to draw a viewer's attention to it and indicate that the police had made a particular selection." *Dailey*, 86 A.D.3d at 579 (internal quotation omitted). These factual determinations are entitled to great deference which "must be sustained unless [they are] clearly erroneous." *Felkner v. Jackson*, 562 U.S. 594 (2011) (internal quotation omitted). Indeed, "[o]n federal habeas review, AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Id.*

Even assuming the photographic arrays were unduly suggestive, there was sufficient reliability in the identification to affirm the appellate ruling. In *Manson v. Brathwaite*, the Supreme Court adapted a totality of the circumstances approach when determining if identification could still be reliable even if it is found suggestive. 432 U.S. 98, 114 (1977); *see also Neil*, 409 U.S. at 199. Here, all the witnesses knew petitioner before the shooting on February 17, 2008. Hr'g Tr. 23, 31, 38, 63, 71, 75, 89, 115. All but two of the eight witnesses immediately identified the petitioner immediately from the photo array. *Id.* at 23, 37, 42, 70, 75, 89. Moreover, the additional overwhelming evidence of petitioner's guilt is further evidence that the witnesses in this case reliably identified the perpetrator of the crime. *See Brisco v. Ercole*, 565 F.3d 80, 94–95 (2d Cir. 2009). Petitioner has not shown that the procedure used by the police—even if it were unduly suggestive—would result in a misidentification and thus has not shown a violation of his constitutional rights.

*6. Failure to Admit Jail House Phone Recordings into Evidence*

Petitioner claims that the trail judge's refusal to admit jailhouse recordings was improper and deprived him of a fair trial. During the trial, the trial judge allowed a jailhouse phone recording between petitioner and a third party into evidence in which petitioner asked the third party to lie regarding his whereabouts at the time of the shooting. Resp't's Br. N.Y. App. Div. at 90. The tape was played during the questioning of petitioner's then-girlfriend, though she was not a party in the phone call. Trial Tr. 2626–27. The trial judge found that this evidence fell within a hearsay exception because it was against the petitioner's penal interest and showed consciousness of guilt. *Id.* at 2634.

During cross-examination of the same witness, petitioner's counsel attempted to introduce seven additional jailhouse phone recordings into evidence claiming they would provide context to the prior call and would impeach the witness's credibility. *Id* at 2634, 2709. The trial judge refused to allow the tapes to be played for the jury because they were self-serving statements and did not fit into a hearsay exception. *Id.* at 2709. Moreover, the judge said that after listening to the calls, none of the conversations "were inconsistent with the [witness's] testimony before this jury." *Id.* at 2710.

Generally, the Constitution requires a criminal defendant be afforded "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). However, "[t]he power of courts to exclude evidence through the application of evidentiary rules that serve the interests of fairness and reliability is well-settled." *Wade v. Mantello*, 333 F.3d 51, 58 (2d Cir. 2003) (citing *Taylor v. Illinois*, 464 U.S. 400, 410 (1988)). In the context of habeas corpus review, courts have "considerable leeway" to balance these factors in evidentiary decisions. *Watson v. Greene*, 640 F.3d 501, 512 (2d Cir. 2011). The reviewing court must ask whether the trial court "so clearly abused its discretion that the state appellate court's failure to

find an abuse of discretion was an unreasonable application of clearly established federal law." *Id.* Passing over petitioner's inability to meet this standard, even if the decision were found to be erroneous, the error would be harmless given the weight of evidence against the defendant.

On habeas corpus review, if a reviewing court finds an evidentiary ruling of the state court erroneous, it does not "automatically rise to the level of constitutional error. The court's duty on a petition for *habeas corpus* is to determine whether the excluded testimony was material to the presentation of the defense so as to deprive the defendant of fundamental fairness." *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988) (citations omitted). "In determining whether the exclusion of defense evidence violated [the right to present a complete defense] . . . the determinative question [is] whether the omitted evidence would have created reasonable doubt." *Wade v. Mantello*, 333 F.3d 51, 58–59 (2d Cir. 2003). Assuming *arguendo* that the trial judge had allowed the tapes to be played and that their contents caused the jury to completely disregard all of that witness's testimony, it would still not be enough to create reasonable doubt in light of the significant evidence of petitioner's guilt. As outlined above, that evidence was overwhelming. Indeed, the trial judge described it as the most overwhelming evidence he had seen in 20 years. Sent. Tr. 11. Absent a showing that his right to a fundamentally fair trial was compromised, petitioner cannot assert a violation of his constitutional rights.

## CONCLUSION

The petition is denied. I also deny a certificate of appealability.

**SO ORDERED.**

Brooklyn, New York
August 13, 2015

*Edward R. Korman*
Edward R. Korman
Senior United States District Judge